**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 14, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT
_____

MICA ALEXANDER MARTINEZ,

    Petitioner - Appellant,

v.

CHRISTE QUICK, Acting Warden,
Oklahoma State Penitentiary,

    Respondent - Appellee.

No. 23-6001
(D.C. No. 5:16-CV-01278-D)
(W.D. Okla.)

_____

## ORDER
_____

Before **BACHARACH**, **MORITZ**, and **FEDERICO**, Circuit Judges.
_____

This matter is before the court on Appellant's Petition for Rehearing and Rehearing En Banc Consideration. We also have a response from Appellee, a reply from Appellant, and a sur-reply from Appellee.

Pursuant to Fed. R. App. P. 40, the petition for panel rehearing is granted in limited part to the extent of the modifications in the introduction, part II.A., and the conclusion of the attached revised opinion, at pages 2, 27–29, and 31. The revised opinion shall be filed as of today's date.

The petition for rehearing en banc and the attached revised opinion were transmitted to all of the judges of the court who are in regular active service. As no

member of the panel and no judge in regular active service on the court requested that the court be polled, the petition for rehearing en banc is denied. *See* Fed. R. App. P. 40(c).

Entered for the Court
CHRISTOPHER M. WOLPERT, Clerk

by: Jane K. Castro
Chief Deputy Clerk

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 14, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

MICA ALEXANDER MARTINEZ,

     Petitioner - Appellant,

v.

CHRISTE QUICK, Acting Warden,
Oklahoma State Penitentiary,

     Respondent - Appellee.

No. 23-6001

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:16-cv-01278-D)**

_____

Brendan Mathew Van Winkle (Katrina Conrad-Legler and Vicki Werneke with him on
the opening brief; Katrina Conrad-Legler with him on the reply brief), Assistant Federal
Public Defenders, Oklahoma City, Oklahoma, for Petitioner-Appellant.

Jennifer L. Crabb, Assistant Attorney General (Gentner F. Drummond, Attorney General,
with her on the brief), Oklahoma City, Oklahoma, for Respondent-Appellee.

_____

Before **BACHARACH**, **MORITZ**, and **FEDERICO**, Circuit Judges.

_____

**MORITZ**, Circuit Judge.

_____

An Oklahoma jury convicted Mica Martinez of two counts of first-degree

murder and sentenced him to death. He now seeks federal habeas relief, contending

that (1) his appellate counsel ineffectively chose not to raise a claim of trial counsel's

ineffective investigation of and presentation of testimony from Martinez's grandfather, mother, and uncle; (2) his sentencing was rendered fundamentally unfair by witness testimony that Martinez had, at one time, used a racial slur; and (3) reversible cumulative error exists. We affirm the denial of relief on the ineffectiveness claim because the Oklahoma Court of Criminal Appeals (OCCA) did not unreasonably apply clearly established federal law or rely on an unreasonable factual finding to hold that neither trial nor appellate counsel performed deficiently. We also affirm the denial of relief on the unfairness claim: the OCCA did not unreasonably apply clearly established federal law or rely on an unreasonable factual finding in ruling that Martinez's sentencing was not rendered fundamentally unfair by the introduction of a single piece of irrelevant and prejudicial evidence. Having found no error, we also affirm the denial of relief on cumulative error.

## Background[1]

Early one morning in October 2009, Martinez borrowed his grandfather's rifle and ammunition and left to go hog hunting. He stopped by a friend's home around 3:30 a.m. and asked him to join, but the friend declined. The friend later testified that Martinez was slurring his speech. Around 4:00 a.m., Martinez called another friend who likewise later reported that Martinez seemed drunk.

---

[1] We take most of the underlying facts from the OCCA's decision affirming Martinez's conviction and sentence, *Martinez v. State* (*Martinez I*), 371 P.3d 1100 (Okla. Crim. App.), *cert. denied* 580 U.S. 967 (2016). *See* 28 U.S.C. § 2254(e)(1) (providing that federal habeas court must presume state court's factual findings are correct unless petitioner shows otherwise by clear and convincing evidence).

Around 4:50 a.m., Martha Miller called 911 to report shots being fired from a vehicle parked near her home. She reported that she and her husband had opened the garage door and that a person with a gun had seen her standing there with the phone.

Shortly thereafter, a driver called 911 to report an abandoned vehicle parked facing the wrong way at an intersection near the Millers' home. When officers arrived at the vehicle, they found the keys in the ignition, the cabin lights on, and loose rounds of ammunition inside.

In the meantime, Martinez—who drove the vehicle and fired the gun near the Millers' home—had broken into the Millers' home, attacked them both, and assaulted their adult son, Shawn Monk. Monk, who was spending the night at his parents' home, awoke in the early morning hours to loud noises and an unfamiliar voice in his parents' bedroom. The unfamiliar voice asked his mother where the money was and made crude statements indicating to Monk that his mother was being sexually assaulted. Monk saw Martinez emerge from the bedroom and followed him down a hallway, pausing briefly to see his mother, obviously injured but still breathing, lying face down on the bed with her pants around her ankles.

Martinez then attacked Monk, and Monk pleaded with Martinez to allow him to get help for his parents. When Martinez briefly relented, Monk called 911 and saw his father lying in the garage, injured but still breathing. Martinez resumed his attack during the 911 call and was still fighting with Monk when law enforcement arrived. The floor was slick with blood, and there was a rifle on the ground. Monk told the officers that the gun belonged to Martinez. The Millers were taken to the hospital,

3

where both died of blunt-force trauma to the head, apparently inflicted by the butt end of Martinez's shotgun. Monk's mother also had injuries consistent with sexual assault.

After officers detained him at the scene, Martinez repeatedly said, "I'm sorry." Officers searched Martinez and discovered keys belonging to Monk and a wallet belonging to Monk's father. They also discovered Martinez's sweatshirt and t-shirt in the Millers' bedroom. Martinez's jeans were stained with blood, and later DNA testing matched the blood to all three victims.

In an initial interview shortly after his arrest, Martinez told law enforcement that a friend named D.J. had attacked the victims. Officers later identified this individual and confirmed his alibi for the morning of the crimes. In a second interview several days after the crimes, Martinez attributed the murders to an unidentified hitchhiker.

At trial in 2013, defense counsel acknowledged that Martinez had killed the Millers but argued that the unplanned nature of the crimes and Martinez's intoxication created reasonable doubt about Martinez's malice aforethought—thus, defense counsel asked the jury to convict Martinez of second-degree, rather than first-degree, murder. Regarding the unplanned nature of the crimes, defense counsel highlighted various facts indicating a lack of premeditation, including that Martinez had drawn attention to himself by shooting his gun by the road; that Martinez had a gun and ammunition with him in his vehicle but did not load the gun before breaking into the Millers' home; that Martinez left the Millers alive; and that Martinez paused

4

his attack on Monk, allowing Monk to call 911. And to support the intoxication defense, defense counsel emphasized testimony from witnesses who said that Martinez seemed drunk in the hours leading up to the crimes, as well as evidence that Martinez had defecated in his pants just before breaking into the Millers' home. Defense counsel also presented expert testimony diagnosing Martinez as a chronic alcoholic who had been drinking heavily from a young age.

The prosecution ultimately did not dispute that Martinez had been drinking before the incident, but it did elicit testimony rebutting the extent of his drinking and the theory that he was a chronic alcoholic. For instance, Martinez's grandfather (with whom Martinez lived) testified that he did not allow alcohol in his home, though he further testified that Martinez had hidden his drinking. The prosecution also introduced evidence of a blood test performed 13 hours after the offense that showed no intoxication. Ultimately, defense counsel chose to abandon a voluntary-intoxication jury instruction, fearing that it would mislead the jury about who bore the ultimate burden of proving malice, but nevertheless urged the jury to convict only on second-degree murder based on the absence of malice aforethought. The jury convicted Martinez of two counts of first-degree murder and one count of assault and battery with a dangerous weapon.

At the capital-sentencing phase, the prosecution sought to prove three statutory aggravating factors: that Martinez "knowingly created a great risk of death to more than one person"; that the murders were "especially heinous, atrocious, or cruel"; and that there was a probability of Martinez "commit[ting] criminal acts of violence that

5

would constitute a continuing threat to society." Okla. Stat. tit. 21, § 701.12(2), (4), (7). In addition to incorporating some of the guilt-phase evidence, the prosecution called several more witnesses. Mary Carothers, the mother of Martinez's oldest child, testified that Martinez had once been in a fight during which he used a racial slur to refer to the two Black men he fought with. Defense counsel immediately moved for a mistrial, but the district court denied the motion and instructed the jury to disregard the racial comment. As to Martinez's drinking, Carothers additionally testified that Martinez did not drink very much. By contrast, Teresa Elam, the mother of Martinez's three other children, testified that Martinez drank a beer or two during the week and would drink to intoxication on the weekends.

The defense incorporated the intoxication evidence from the guilt phase—the lay testimony that Martinez had seemed drunk the night of the offense and the expert testimony about his chronic alcoholism. The defense also presented testimony from a mitigation specialist on Martinez's social and mental-health history, including his history of substance and alcohol abuse, his mental-health struggles with depression and self-esteem, and an incident of sexual molestation at a young age. This mitigation specialist, along with Martinez's aunt, generally established that Martinez's mother was a teenager when she had him, and she abandoned him to her parents (Martinez's grandparents) when he was an infant. Martinez's grandparents adopted and raised him but did not tell him that the woman he believed was his older sister was, in fact, his mother. Martinez's grandmother died when he was 12; he and his grandfather took the loss hard, and his grandfather provided minimal parenting

6

support in the years that followed. Around the time Martinez graduated from high school, he learned the secret of his adoption. In addition to this life history, the defense also presented evidence from several prison guards, who testified to Martinez's good conduct during the three and a half years he had been incarcerated pending trial. And Martinez's aunt and two of his children testified that he was a good father.

In the end, the jury found two aggravators—that Martinez created a great risk of death to more than one person and that the murders were especially heinous, atrocious, or cruel—and sentenced him to death. The state court accordingly imposed death sentences on the murder counts, plus ten years on the assault.

The OCCA affirmed on direct appeal. *Martinez I*, 371 P.3d at 1119. Among other rulings, it found sufficient evidence of malice aforethought and held that trial counsel did not perform deficiently in waiving a voluntary-intoxication instruction. *Id.* at 1110–11, 1117–19. And as particularly relevant here, the OCCA rejected Martinez's argument "that testimony about his use of racial epithets during a fight . . . denied him a fair sentencing proceeding." *Id.* at 1114–15.

The OCCA then denied each of Martinez's applications for postconviction relief. *Martinez v. State* (*Martinez II*), No. PCD-2013-936 (Okla. Crim. App. May 5, 2016) (unpublished); *Martinez v. State* (*Martinez III*), No. PCD-2017-951 (Okla. Crim. App. Oct. 17, 2017) (unpublished); *Martinez v. State* (*Martinez IV*), 502 P.3d 1115 (Okla. Crim. App. 2021). As pertinent here, it rejected the claim in Martinez's first postconviction application that Martinez received ineffective assistance of

7

counsel (IAC) when appellate counsel failed to assert a claim that trial counsel ineffectively investigated and thus failed to present mitigation testimony from Martinez's grandfather, mother, and uncle, as well as Elam, the mother of three of Martinez's children. *See Martinez II*, slip op. at 4, 10. Applying the IAC framework from *Strickland v. Washington*, 466 U.S. 668 (1984), the OCCA held that counsel did not perform deficiently because the investigation was reasonable and the mitigation presentation reflected reasonable strategic choices. *Martinez II*, slip op. at 11–12. The OCCA later held that an expanded IAC claim in Martinez's second postconviction application—challenging appellate counsel's failure to raise a claim that trial counsel inadequately investigated and presented Martinez's full background and life history—was procedurally barred because it could have been brought in the first application.[2] *See Martinez III*, slip op. at 5.

Martinez then filed the underlying federal habeas petition, raising seven issues, including the two IAC claims from his postconviction applications, the fair-sentencing claim from his direct appeal, and a claim of cumulative error. After the district court denied relief and a certificate of appealability (COA), Martinez sought a COA from this court. *See* 28 U.S.C. § 2253(c)(1)(A). We granted him a COA to appeal the district court's resolution of (1) his appellate IAC claim premised on the

---

[2] Martinez's third application for postconviction relief involved arguments premised on *McGirt v. Oklahoma*, 591 U.S. 894 (2020), that are not relevant to this appeal. *See Martinez IV*, 502 P.3d at 1119–20 (holding that Congress disestablished Indian reservation at issue in Martinez's case and that even if it had not, "*McGirt*'s holding, and its impact on state criminal jurisdiction in a vastly expanded Indian [c]ountry," did not apply retroactively to cases on collateral review).

failure to raise a claim that trial counsel ineffectively investigated and presented mitigation testimony from Martinez's family members; (2) his fair-sentencing claim premised on the introduction of an irrelevant and inflammatory racist epithet during the penalty phase; and (3) his cumulative-error claim.

## Analysis

In a habeas appeal, "we review the district court's legal analysis of the state court['s] decision de novo and its factual findings, if any, for clear error." *Frederick v. Quick*, 79 F.4th 1090, 1102 (10th Cir. 2023) (quoting *Smith v. Sharp*, 935 F.3d 1064, 1071 (10th Cir. 2019)), *cert denied*, 144 S. Ct. 2634 (2024). However, the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996 significantly limits "our review of federal habeas claims that were adjudicated on the merits in state-court proceedings." *Id.* (quoting *Smith*, 935 F.3d at 1071). "The AEDPA standard is 'highly deferential . . . [and] demands that state-court decisions be given the benefit of the doubt.'" *Littlejohn v. Trammel*, 704 F.3d 817, 824 (10th Cir. 2013) (omission and alteration in original) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). Thus, when a state court has adjudicated a claim on its merits, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate[-]court proceeding." 28 U.S.C. § 2254(d)(1)–(2). Review under either prong of § 2254(d) is limited "to the record that was before the state court that adjudicated the claim on the

9

merits." *Cullen v. Pinholster*, 563 U.S. 170, 180–81 (2011); *see also Hooks v. Workman*, 689 F.3d 1148, 1163 (10th Cir. 2012) (explaining that "plain terms of the statute indicate" review under § 2254(d)(2) is limited to state-court record).

"In reviewing under § 2254(d)(1), we must first 'determine the relevant clearly established law,'" which comes exclusively from the holdings of the Supreme Court, not its dicta. *Frederick*, 79 F.4th at 1103 (quoting *Budder v. Addison*, 851 F.3d 1047, 1051 (10th Cir. 2017)). Next, a state court's ruling is "contrary to" such clearly established law if it "applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Court] ha[s] done on a set of materially indistinguishable facts." *Id.* (alterations in original) (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court unreasonably applies "Supreme Court precedent 'if the state court correctly identifies the governing legal principle from [the Court's] decisions but unreasonably applies it to the facts of the particular case.'" *Id.* (alteration in original) (quoting *Bell*, 535 U.S. at 694). An unreasonable application of law is more than an incorrect application of law; a "petitioner must show that a state court's decision is 'so obviously wrong' that no reasonable judge could arrive at the same conclusion given the facts of the [petitioner's] case." *Id.* (quoting *Shinn v. Kayer*, 592 U.S. 111, 118 (2000)).

Section 2254(d)(2) requires a petitioner to show that the state court's decision "was based on an unreasonable determination of the facts." Like § 2254(d)(1), this is a difficult standard to meet. *See id.* at 1104. We will not classify a state court's factual finding "as unreasonable merely because we would have reached a different

10

conclusion in the first instance." *Id.* (quoting *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015)). Indeed, even an incorrect factual finding is insufficient to satisfy § 2254(d)(2): if "reasonable minds reviewing the record might disagree about the finding in question," then we will defer to a state court's factual findings. *Id.* (quoting *Johnson v. Martin*, 3 F.4th 1210, 1218–19 (10th Cir. 2021)). Additionally, to satisfy § 2254(d)(2), a petitioner must "show 'that the [state court] based its decision on the factual error.'" *Id.* (alteration in original) (quoting *Harris v. Sharp*, 941 F.3d 962, 1003 (10th Cir. 2019)).

Applying these standards, we consider each of Martinez's claims in turn.

## I.     Family IAC Claim

In his first claim, Martinez asserts that appellate counsel ineffectively chose not to argue on direct appeal that trial counsel's failure to investigate resulted in an unreasonable decision not to present mitigation testimony from readily available family members—namely, his grandfather, mother, and uncle.[3] Because the OCCA adjudicated this claim on its merits, we will defer to that ruling unless Martinez can satisfy § 2254(d). He advances arguments under both § 2254(d)(1) and (d)(2).[4]

### A.     Section 2254(d)(1)

Martinez first argues that the OCCA unreasonably applied clearly established

---

[3] At the OCCA, Martinez included Elam in this claim, but he dropped her from his federal habeas claim.

[4] The State urges us to find this claim unexhausted and subject to an anticipatory procedural bar or to decline to consider it on preservation grounds because the contours of Martinez's claim have shifted from how he presented it to the OCCA and the district court. But rather than resolve the "problematic" question of

11

federal law to reject his family IAC claim. *See* § 2254(d)(1). The applicable clearly established federal law is *Strickland*'s two-part test for ineffectiveness—deficient performance and resulting prejudice. *See Frederick*, 79 F.4th at 1104. But because the OCCA only ruled on the performance prong, that is the only prong subject to § 2254(d). *Cf. Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (reviewing prejudice prong of *Strickland* claim in habeas de novo because state court did not reach that issue).

Section 2254(d)(1) is particularly difficult to meet for IAC claims. *Davis v. Sharp*, 943 F.3d 1290, 1299 (10th Cir. 2019). The question is not "merely whether counsel performed reasonably under *Strickland*; instead, [it is] 'whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.'" *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 105 (2011)). That means, given the

---

whether Martinez's claim has changed so much as to be unexhausted, we exercise our discretion to bypass this issue and reject the claim on the merits. *Cannon v. Mullin*, 383 F.3d 1152, 1159 (10th Cir. 2004), *abrogated in part on other grounds by Pinholster*, 563 U.S. 170; *see also* § 2254(b)(2) (allowing courts to deny claim on merits notwithstanding failure to exhaust). We similarly exercise our discretion to overlook any preservation problem resulting from purported differences between how Martinez presented this claim below and how he presents it on appeal. *See Jones v. Warrior*, 805 F.3d 1213, 1219 n.2 (10th Cir. 2015). And even accepting that Martinez's claim has shifted over time, we reject the State's related and passing suggestion that the claim on appeal impermissibly combines the family IAC claim from Martinez's first postconviction application (for which he has a COA) with the procedurally barred, expanded IAC claim in his second postconviction application (for which he does not have a COA). Simply put, the family IAC claim presented on appeal does not incorporate portions of the expanded IAC claim. *Cf. Tryon v. Quick*, 81 F.4th 1110, 1147–48 (10th Cir. 2023) (finding no jurisdiction to consider IAC arguments that were clearly part of procedurally barred IAC claim for which petitioner did not have COA), *cert. denied*, 144 S. Ct. 2586 (2024).

deference baked into *Strickland* (as we will discuss) and AEDPA, our review of the OCCA's no-deficient-performance ruling is "doubly deferential." *Pinholster*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

Martinez's particular IAC claim is aimed at appellate ineffectiveness, which requires Martinez to show "that (1) appellate counsel performed deficiently in failing to raise the particular issue on appeal and (2) but for appellate counsel's deficient performance, there exists a reasonable probability the petitioner would have prevailed on appeal." *Davis*, 943 F.3d at 1299. Thus, assessing appellate IAC claims typically requires reviewing "the merits of the omitted issue"—omitting a meritless issue "will not constitute deficient performance," but omitting an issue with obvious or at least arguable merit might. *Id.* (first quoting *Banks v. Reynolds*, 54 F.3d 1508, 1515 (10th Cir. 1995); and then quoting *Miller v. Mullin*, 354 F.3d 1288, 1298 (10th Cir. 2004)); *see also Miller*, 354 F.3d at 1298.

Here, the omitted IAC claim is a challenge to trial counsel's investigation of Martinez's grandfather, mother, and uncle, an investigation that informed the decision not to present mitigation testimony from these witnesses. As a general matter, courts measure counsel's performance against objective professional norms, such as the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (ABA Guidelines). *See Rompilla*, 545 U.S. at 380–81; *Hooks*, 689 F.3d at 1201. In so doing, "we entertain 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Littlejohn*, 704 F.3d at 859 (quoting *Matthews v. Workman*,

13

577 F.3d 1175, 1190 (10th Cir. 2009)).

On investigation in particular, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Relevant here, the ABA Guidelines urge counsel to undertake a mitigation investigation that covers a defendant's entire life history, including interviewing a defendant's family members, minimizing inconsistencies, and using collateral witnesses to bolster expert testimony. *See* ABA Guidelines, 31 Hofstra L. Rev. 913, 1022–26, 1055–56 (2003). And we have similarly explained that "because of the crucial mitigating role that evidence of a poor upbringing or mental[-]health problems can have in the sentencing phase, defense counsel must pursue this avenue of investigation with due diligence." *Hooks*, 689 F.3d at 1201–02 (quoting *Wilson v. Sirmons*, 536 F.3d 1064, 1085 (10th Cir. 2008)). However, "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla*, 545 U.S. at 382–83.

In concluding that Martinez's counsel did not perform deficiently, the OCCA focused on trial counsel's performance, stating that Martinez's "materials and the trial transcript show a reasonable pre[]trial investigation of mitigating evidence" and noting that "[t]rial counsel had access to an investigator and a mitigation expert[] and understood the importance of developing and presenting mitigating factors for the jury to consider." *Martinez II*, slip op. at 10. The OCCA described how the trial

14

transcript showed "a detailed defense opening statement and closing argument about mitigating circumstances, including [Martinez's] family history, substance abuse, the effects of sexual abuse and loss of his grandmother, depression, alcoholism, that he was a kind and caring parent and family member, and had positively adjusted to confinement." *Id.* The OCCA also noted that trial "[c]ounsel presented both lay and expert testimony . . . about this broad array of mitigating circumstances." *Id.* And it concluded that the decision not to call additional witnesses was strategic, citing an affidavit from a defense investigator noting as much with regard to Martinez's grandfather. *Id.* at 10–11. So the OCCA concluded that trial counsel did not perform deficiently in investigating or failing to present these three witnesses in mitigation and that appellate counsel accordingly did not perform deficiently in failing to raise such a claim on direct appeal. *Id.* at 11.

Reviewing this analysis under § 2254(d)(1), the district court concluded that the OCCA's decision was not unreasonable. In so doing, it noted that testimony from Martinez's grandfather "posed significant risks for the defense" because the grandfather (1) did not believe that Martinez had a problem with alcohol, "which directly undercut the defense's attempt to show that [Martinez] was a chronic alcoholic"; and (2) suggested that one of the victims, Monk, had been involved in the murders. R. vol. 1, 649. The district court further echoed the OCCA's reliance on the affidavit from the defense investigator, which stated that trial counsel made a strategic decision not to call Martinez's grandfather as a mitigation witness. As to Martinez's mother, the district court stated that she would have been a risky witness

15

because of her history of mental instability and drug use. Last, the district court reasoned that trial counsel would have had difficulty obtaining testimony from Martinez's uncle, who was deployed to Afghanistan during the trial, and that testimony from all three individuals would have been cumulative of the testimony from the mitigation specialist.

On appeal, Martinez argues that the OCCA unreasonably failed to consider the underlying investigation and focused instead only on the reasonableness of the choices made in the overall mitigation presentation.[5] In support, he emphasizes *Strickland*'s holding that a decision based on an unreasonable investigation cannot be a matter of strategy: "strategic choices made after less[-]than[-]complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690–91. But as the State responds, Martinez entirely ignores the OCCA's plainly stated conclusion on the investigation aspect of the claim at the outset of its analysis: "[Martinez's] materials and the trial transcript show a reasonable pre[]trial investigation of mitigating evidence."[6] *Martinez II*, slip op. at 10. To be sure, the OCCA did not

---

[5] Martinez similarly faults the district court for failing to adequately consider the investigation aspect of his IAC claim, and he also argues that the district court improperly invented its own rationale to support the OCCA's ruling instead of focusing on the reasons that the OCCA gave. Because we review the district court's ruling under § 2254(d) de novo, any such errors by the district court would not require reversal, so we need not and do not reach these arguments.

[6] Martinez is accordingly wrong when he states that the OCCA mentioned the underlying investigation "[o]nly once" and in connection with the affidavit from a defense investigator. Aplt. Br. 23.

16

expressly cite or discuss legal principles or standards for such investigations. Yet AEDPA requires us to "'presum[e] that state courts know and follow the law' and give 'state-court decisions . . . the benefit of the doubt.'" *Wood v. Carpenter*, 907 F.3d 1279, 1302 (10th Cir. 2018) (alteration and omission in original) (quoting *Woodford*, 537 U.S. at 24). We therefore cannot read anything into the OCCA's failure to expressly discuss the legal standards governing counsel's duty to investigate, and the OCCA's decision is not unreasonable on the basis that it ignored *Strickland*'s holding about the necessary connection between investigation and strategic choices.

Martinez next argues that the OCCA's decision is unreasonable because the trial transcript reveals the constitutionally inadequate investigation. To do so, he describes the intoxication defense offered at trial and the State's rebuttal of that defense in general terms, asserting that "[t]he implosion of the intoxication defense revealed counsel's investigation was unreasonable." Aplt. Br. 27. But Martinez does not develop a factual basis to support the purported implosion of the intoxication defense beyond describing the inconsistent testimony about the extent of Martinez's drinking. And a reasonable jurist could conclude that the intoxication defense was weak from the start, such that no further investigation into this weakness was necessary. Additionally, this argument ignores that intoxication was only one part of the overall defense theory aimed at creating reasonable doubt on malice aforethought. *See Martinez I*, 371 P.3d at 1119 (describing defense presentation as "a thoughtful argument for convicting [Martinez] of lesser[-]included offenses, presenting jurors

17

with reasons to doubt the element of malice aforethought that were not entirely dependent on the relatively weak intoxication evidence").

At best, Martinez quotes trial counsel's statement to the jury that the defense "presented intoxication because frankly we don't understand what happened that night. Maybe his intoxication explains it; maybe it doesn't." Aplt. Br. 28 (quoting Tr. vol. IX, 34). Yet this statement, viewed through *Strickland*'s lens of "a heavy measure of deference to counsel's judgments," is a candid acknowledgment of the weakness of a part of the defense's overall theory. 466 U.S. at 691. It does not, standing alone, establish that the weakness of the defense was the result of an inadequate investigation into Martinez's grandfather, mother, and uncle.

Indeed, much of Martinez's argument turns on vague speculation that "further investigation into [his] family would have supported the intoxication defense at trial, informed the experts[,] or prepared counsel for contradictory testimony." Aplt. Br. 27. But in so doing, Martinez implicitly acknowledges the extent of the investigation that actually occurred. For instance, Martinez highlights that a defense investigator (one of the only individuals who remained part of the defense team from start to finish) spoke with Martinez's grandfather and mother, among other family members, and wrote memos showing that these individuals "had different impressions of his drinking." *Id.* at 29. Moreover, Martinez notes that about two years before trial, one of his earlier attorneys had filed a witness list stating that the defense planned to call *these three specific witnesses*—his grandfather, mother, and uncle—to testify about Martinez's childhood, the secret of his biological mother, and his drinking. Martinez

18

describes this witness list as a lead that trial counsel deficiently failed to follow up on, but he offers no evidence to suggest that trial counsel was unaware of this early witness list. And given the presumption of reasonable performance, the witness list instead demonstrates that trial counsel was aware of these witnesses and their prospective testimony and strategically chose not to present them.

That Martinez cannot show counsel was unaware of this witness list distinguishes *Rompilla*, which Martinez heavily relies on. There, the Court held that defense counsel performed deficiently when they failed to review the court file of the defendant's prior conviction despite knowing that the state planned to introduce both the conviction and the victim's testimony from the prior offense. *See Rompilla*, 545 U.S. at 389–90. Crucially, the Court specifically reviewed evidence in the trial record showing that the defense "did not look at any part of that file, including the transcript, until warned by the prosecution" on "the day before the evidentiary sentencing phase began." *Id.* at 384. And at an evidentiary hearing, defense counsel confirmed as much. *Id.* at 385. But here, Martinez points only to the existence of the witness list, not to any evidence that counsel failed to review it. And that places the witness list and trial counsel's investigation of it well within the double deference we must afford to both trial counsel's performance and the OCCA's assessment of that performance. *See Pinholster*, 563 U.S. at 190.

Indeed, a deeper look at *Rompilla* further demonstrates the reasonableness of the OCCA's conclusion that Martinez's counsel did not perform deficiently. The Court began by noting that because "[a] standard of reasonableness applied as if one

19

stood in counsel's shoes spawns few hard-edged rules, . . . the merits of a number of counsel's choices in this case [we]re subject to fair debate." *Rompilla*, 545 U.S. at 381. For instance, although the defendant's attorneys had interviewed the defendant, his family members, and mental-health experts, postconviction counsel later unearthed "a number of likely avenues the trial lawyers could fruitfully have followed in building a mitigation case," including school records, records of the defendant's juvenile and adult incarcerations, and evidence of a history of alcohol abuse. *Id.* at 381–83. The Court found "room for debate about trial counsel's obligation to follow *at least some* of those potential lines of enquiry." *Id.* at 383 (emphasis added). But it went no further on those lines because it definitively held that counsel had unreasonably failed to examine the file of the defendant's prior conviction. *Id.* And in so doing, it compared the failure to review "a file disclosing what the prosecutor knows and even plans to read from in his case" to the ostensibly more reasonable failure to "[q]uestion[] a few more family members," which "can promise less than looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there." *Id.* at 389.

This case lies firmly in the latter camp. Despite Martinez's insistence that further investigation of his grandfather, mother, and uncle would have revealed the limitations of the intoxication defense and allowed counsel to present a more coherent mitigation presentation, the record before the OCCA showed that further questioning of these family members "promise[d] less than looking for a needle in a haystack"; counsel had very little "reason to doubt there [wa]s any needle there,"

based on what counsel already knew about these family members and their impressions of Martinez's drinking. *Id.* We therefore conclude that the OCCA did not unreasonably apply *Strickland*'s performance prong when rejecting Martinez's family IAC claim.

### B.     Section 2254(d)(2)

Martinez separately argues that the OCCA based its decision on the unreasonable factual determination that trial counsel strategically chose not to present testimony from Martinez's grandfather. On this point, the OCCA wrote that "[a]n affidavit of trial counsel's investigator specifically states that trial counsel did not present further penalty phase testimony from [Martinez's grand]father 'based on strategy.'" *Martinez II*, slip op. at 10–11 (quoting Appl. for Postconviction Relief, Attach. 4, ¶ 6).

Martinez asserts that the OCCA's factual finding about strategically choosing not to present his grandfather "'plainly and materially' misstated the record." Aplt. Br. 44 (quoting *Smith v. Duckworth*, 824 F.3d 1233, 1250 (10th Cir. 2016)). But we see no such misstatement. The affidavit in question reads as follows: "It is my understanding that trial attorneys did not call [Martinez's grandfather] as a second[-]stage [witness] based on strategy." Appl. for Postconviction Relief, Attach. 4, ¶ 6. This stated "understanding" of strategic reasons not to call Martinez's grandfather clearly supports the OCCA's factual finding that such strategic reasons existed.

Martinez additionally faults the OCCA for relying on the affidavit because its

21

statement about strategy is conclusory and because the OCCA did not directly discuss the reasonableness of the investigation underlying that strategic decision. This argument flips *Strickland*'s presumption of reasonable performance on its head. It is Martinez's burden to produce evidence calling into question the reasonableness of counsel's performance, and he produced only an affidavit reflecting a strategic decision, unaccompanied by any evidence to suggest that the underlying investigation was unreasonable. At the very least, reasonable minds could disagree about the OCCA's extrapolation from the investigator's unexplained understanding to a definitive finding. *See Frederick*, 79 F.4th at 1104. We therefore defer to the OCCA's factual finding, like the district court did, and Martinez cannot satisfy § 2254(d)(2) on this basis.

Martinez relatedly argues that the OCCA's factfinding process was unreasonable because it refused to conduct an evidentiary hearing. But "a state court's decision not to hold an evidentiary hearing only renders its factual findings unreasonable . . . if all '[r]easonable minds' agree that the state court needed to hold a hearing in order to make those factual determinations." *Smith v. Aldridge*, 904 F.3d 874, 882 (10th Cir. 2018) (alteration in original) (quoting *Brumfield*, 576 U.S. at 314). And we agree with the district court's summary conclusion that Martinez cannot meet this standard—indeed, he only cursorily attempts to. For instance, he writes that the OCCA "presumed his counsel strategically decided against further investigation notwithstanding contrary evidence presented in his postconviction application." Aplt. Br. 45. Yet he neither elaborates on what that "contrary evidence"

22

was nor connects his arguments to the relevant legal standard. *Id.* We therefore conclude that the OCCA did not base its *Strickland* performance ruling on an unreasonable refusal to hold an evidentiary hearing, and Martinez cannot satisfy § 2254(d)(2) on this basis.

In sum, because Martinez cannot satisfy either prong of § 2254(d), we must defer to the OCCA's decision and affirm the district court's order denying Martinez relief on his IAC claim.[7]

## II.　　Fair-Sentencing Claim

Martinez next contends that he is entitled to habeas relief on his claim that the introduction of evidence about his use of a racial slur rendered his sentencing fundamentally unfair. Recall that at sentencing, Carothers, the mother of one of Martinez's children, testified for the prosecution about a fight Martinez had been in and said that Martinez used a racial slur to refer to the Black men he fought with. Defense counsel moved for a mistrial, and the prosecutor responded that he was unaware Carothers would use the racial slur. The district court denied the mistrial motion and instructed the jury to disregard the slur. Defense counsel later made a record that there were two African Americans on the jury and explained that— although he did not think the prosecutor expected Carothers to use a racial slur—it was not a complete surprise given that defense counsel had warned the prosecutor

---

[7] Given this conclusion, we reject Martinez's argument that he was entitled to an evidentiary hearing in the district court. *See Vreeland v. Zupan*, 906 F.3d 866, 881 n.4 (10th Cir. 2018) (explaining that evidentiary hearing in district court is only warranted if petitioner first satisfies § 2254(d)).

about her volatility.

On direct appeal, Martinez challenged the introduction of the racial slur. The bulk of his direct-appeal brief focused on a state-law evidentiary argument and a First Amendment argument, but he also asserted that this was a "highly prejudicial violation of . . . his Eighth Amendment right to a reliable capital sentencing." R. vol. 1, 96. In support of this latter point, he cited *Caldwell v. Mississippi*, 472 U.S. 320 (1985), and *Woodson v. North Carolina*, 428 U.S. 280 (1878) (plurality opinion).

Addressing this claim, the OCCA first rejected the state-law evidentiary argument and noted that "the trial court's prompt admonition cured any error from this fleeting remark." *Martinez I*, 371 P.3d at 1115. Turning to the First Amendment argument, the OCCA noted that Martinez's "use of racist language in this case was unexpectedly interjected by a lay witness," that the prosecution did not maintain a link between the slur and the murders or the aggravators, and that the jury ultimately rejected the continuing-threat aggravator, toward which this portion of the witness's testimony was directed. *Id.* So the OCCA rejected Martinez's First Amendment argument, again concluding that "the evidentiary error, if any, was cured by the trial court's instruction." *Id.*

Despite denying relief on this claim overall, the OCCA did not expressly discuss the fair-sentencing aspect of Martinez's claim. So Martinez initially contends that because the OCCA did not adjudicate this claim on its merits, we should review it de novo, bypassing § 2254(d). *See Littlejohn*, 704 F.3d at 825 (noting de novo review of claims not adjudicated on their merits in state court). But "[w]hen a federal

24

claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Johnson v. Williams*, 568 U.S. 289, 298 (2013) (alteration in original) (quoting *Richter*, 562 U.S. at 99). *Johnson*'s presumption applies even "when a state-court opinion addresses some but not all of a defendant's claims." *Id.*; *see also Fairchild v. Trammell*, 784 F.3d 702, 712 (10th Cir. 2015) ("[W]e have held that a state court reaches a decision on the merits even when it fails either to mention the federal basis for the claim or cite any state or federal law in support of its conclusion." (quoting *Dodd v. Trammell*, 753 F.3d 971, 983 (10th Cir. 2013))). So the OCCA's failure to expressly discuss this claim is insufficient to overcome the *Johnson* presumption. *See Johnson*, 568 U.S. at 1093 (holding that state court adjudicated federal claim on its merits even though state court only discussed applicable state law).

Martinez also cites *James v. Ryan*, 733 F.3d 911 (9th Cir. 2013), but that case is distinguishable. There, the state court held the petitioner's claims procedurally barred and then noted—in a single concluding line—that the defendant had no colorable claims. *James*, 733 F.3d at 913, 915–16. On habeas review, the Ninth Circuit declined to treat that final concluding line as an alternative merits ruling, reasoning that *Johnson*'s presumption of merits adjudication "d[id] not require [courts] to ignore a state court's explicit explanation of its own decision." *Id.* at 916.

25

Nothing similar occurred here.[8] So we presume, like the district court did, that the OCCA adjudicated Martinez's claim on its merits. With the standard of review decided, we turn to Martinez's next hurdle to obtaining habeas relief on this claim—§ 2254(d). He again advances arguments under both prongs.

## A.　Section 2254(d)(1)

Recall that § 2254(d)(1) requires a petitioner to show that a state court's decision was contrary to or an unreasonable application of clearly established federal law. Accordingly, the existence of clearly established federal law is a threshold issue for review. *See Frederick*, 79 F.4th at 1103. And "clearly established law consists of Supreme Court holdings in cases where the facts are at least closely[ ]related or similar to the case" at hand. *House v. Hatch*, 527 F.3d 1010, 1016–17 (10th Cir. 2008).

Martinez first argues that the OCCA's decision was contrary to *Caldwell*. But *Caldwell* held that a prosecutor constitutionally erred by telling the jury that its sentence would be reviewed for correctness. *See* 472 U.S. at 328–29. That error bears no similarity to the introduction of an irrelevant racial slur in this case. To be sure,

---

[8] Martinez also cites *Graham v. White*, where a district court held that the presumption of merits adjudication did not apply because "the OCCA . . . inadvertently overlooked (or intentionally ignored) [the petitioner's] Fourteenth Amendment due[-]process claim." 678 F. Supp. 3d 1332, 1354–56 (N.D. Okla. 2023). But after Martinez filed his opening brief, we reversed the lower *Graham* court on this ground, holding instead that the petitioner failed to rebut the *Johnson* presumption because the OCCA's decision was at best ambiguous as to whether it adjudicated the constitutional aspect of the claim. *See Graham v. White*, 101 F.4th 1199, 1206 (10th Cir. 2024).

26

*Caldwell* did note "the Eighth Amendment's heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" *Id*. at 323 (quoting *Woodson*, 428 U.S. at 305). But "holdings that speak only at a high level of generality" do not supply clearly established federal law under AEDPA. *Brown v. Davenport*, 596 U.S. 118, 136 (2022). So *Caldwell*'s broad statement does not assist Martinez; we cannot "extract clearly established law from the general legal principles developed in factually distinct contexts." *House*, 527 F.3d at 1016 n.5.

And critically, the Supreme Court itself has rejected similar attempts to extend *Caldwell*, explaining that "*Caldwell* is relevant only to certain types of comment—those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." *Darden v. Wainwright*, 477 U.S. 168, 183 n.15 (1986); *see also Romano v. Oklahoma*, 512 U.S. 1, 9 (1994) (concluding that error in admitting evidence of defendant's prior death sentence did not violate "the principle established in *Caldwell*" because it did not "impermissibly undermine[] the sentencing jury's sense of responsibility"). Here, Martinez does not argue that the racial slur impacted the jury's sense of responsibility, nor does the record offer him a basis to do so. Accordingly, we agree with the district court that *Caldwell* does not supply the applicable clearly established federal law.[9]

---

[9] Nor does *Woodson*, which Martinez cites only in passing. There, the Court struck down a state's mandatory death-penalty scheme, a ruling that has nothing to do with the evidentiary error that Martinez presses here. *See Woodson*, 428 U.S. at 305.

Next, Martinez seeks to invoke the more general due-process principle that the admission of irrelevant evidence can render a trial fundamentally unfair, citing *Romano*, which considered "whether the admission of evidence regarding petitioner's prior death sentence so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process." 512 U.S. at 12. For the sake of argument, we again overlook Martinez's failure to clearly invoke Fourteenth Amendment due-process principles at either the OCCA or the district court. *See Cannon*, 383 F.3d at 1159; *Jones*, 805 F.3d at 1219 n.2. We also overlook Martinez's failure to raise this argument properly in his opening brief, where he passingly asserts that he "meets" the "so infected" standard (and incorrectly places this argument in his discussion of § 2254(d)(2) instead of § 2254(d)(1)). Aplt. Br. 76; *see also United States v. Montgomery*, 550 F.3d 1229, 1231 n.1 (10th Cir. 2008) (exercising discretion to overlook waiver caused by "failure to raise an argument in an opening brief"). Having done so, we find clearly established federal law governing Martinez's racial-slur claim: "when 'evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief.'" *Andrew v. White*, 145 S. Ct. 75, 78 (2025) (quoting *Payne v. Tennessee*, 501 U.S. 808, 825 (1991)); *see also id.* at 82 (citing *Romano* as application of this principle in capital sentencing).

The next question is whether the OCCA unreasonably applied this legal principle when it denied Martinez's unfair-trial claim. Or, stated differently, "whether a fairminded jurist reviewing this record could disagree with [Martinez]

28

that the trial court's [inadvertent] admission of irrelevant evidence was so 'unduly prejudicial' as to render [his capital sentencing] 'fundamentally unfair.'" *Id.* at 83 (quoting *Payne*, 501 U.S. at 825). And here, a fairminded jurist could (and perhaps would) disagree with Martinez's view that the inadvertent introduction of the racial slur rendered his sentencing fundamentally unfair. True, Carothers attributed a repugnant racial slur to Martinez: testimony that was both irrelevant and prejudicial. But simply put, this was brief, unexpected testimony that the trial court immediately instructed the jury to disregard and that the prosecution never mentioned again. So the OCCA did not unreasonably conclude that the slur was not so unduly prejudicial as to render Martinez's sentencing fundamentally unfair in violation of Fourteenth Amendment due process. Thus, Martinez cannot satisfy § 2254(d)(1)'s barrier to habeas relief.

### B.    Section 2254(d)(2)

Martinez next contends that the OCCA's ruling was based on an unreasonable factual finding that the witness's statement attributing a racial slur to Martinez was "unexpected[]." *Martinez I*, 371 P.3d at 1115. According to Martinez, the record belies this finding because the prosecutor repeatedly and unnecessarily mentioned the race of the men that Martinez fought with, noting race in the witness notice, in his opening statement, and during his questioning. Martinez also emphasizes that defense counsel warned the prosecutor that the witness was volatile and harbored ill will

29

toward Martinez.[10]

Martinez's argument lacks force. As the State details, substantial record evidence supports the OCCA's conclusion that the witness's comment was unexpected.[11] Upon the mistrial motion, the prosecutor told the trial court that he did not know the witness was going to say what she said. And despite characterizing the statement as less than a complete surprise, defense counsel largely agreed that the prosecutor was unaware that the witness would attribute a racial slur to Martinez. And the trial court noted that from its perspective, the prosecution was just as shocked as the rest of the courtroom. To be sure, Martinez is correct that the prosecutor unnecessarily mentioned the race of the men that Martinez fought with at several points. But he goes too far when he argues that the prosecutor *provoked* the witness into this improper comment. In the end, the obvious record support for the OCCA's finding that the comment was unexpected means that the OCCA did not "plainly misapprehend[] or misstate[] the record." *Frederick*, 79 F.4th at 1104

---

[10] We overlook that Martinez does not appear to have made this argument to the OCCA. *See Cannon*, 383 F.3d at 1159. But we limit our review to the record that was before the state court, ignoring Martinez's reliance on an affidavit from defense counsel that Martinez submitted for the first time as an attachment to his federal habeas petition. *See* § 2254(d)(2) (providing that factual finding must be unreasonable "in light of the evidence presented in the [s]tate[-]court proceeding"); *Hooks*, 689 F.3d at 1163.

[11] Along the way, the State accuses Martinez of being disingenuous because he "admi[tted] on direct appeal that 'the record does not show that the prosecutor planned for [the witness] to ambush [Martinez] with her testimony.'" Aplee. Br. 70 (quoting R. vol. 1, 95). This reads too much into the record—in full, the relevant paragraph of Martinez's direct-appeal brief takes the position that the prosecutor left the door open for a volatile witness to say something offensive and irrelevant.

(quoting *Menzies v. Powell*, 52 F.4th 1178, 1195 (10th Cir. 2022)). Martinez thus

cannot satisfy § 2254(d)(2).

Because Martinez cannot satisfy either prong of § 2254(d) on this claim, we

defer to the OCCA's decision and affirm the district court's denial of habeas relief.[12]

And having found no errors, we likewise affirm the district court's denial of relief on

Martinez's cumulative-error claim. *See Hanson v. Sherrod*, 797 F.3d 810, 853 (10th

Cir. 2015) (noting that court "cannot engage in a cumulative error analysis absent at

least two errors").

**Conclusion**

Because the OCCA did not unreasonably apply *Strickland* or rely on an

unreasonable factual finding when holding that neither trial nor appellate counsel

performed deficiently, we affirm the district court's denial of relief on Martinez's

IAC claim. We similarly affirm the district court's denial of relief on Martinez's

claim that the introduction of a racial slur rendered his capital sentencing

fundamentally unfair. The OCCA did not unreasonably apply clearly established

federal law on this point; nor did it rely on an unreasonable factual finding. Last,

because we've found no errors, we also affirm the denial of relief on cumulative

error.

---

[12] We therefore need not address the State's additional arguments that the OCCA's ruling was not based on the finding of unexpectedness and that Martinez is not entitled to relief on this claim under *Brecht v. Abrahamson*, 507 U.S. 619 (1993).