**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**January 13, 2026**

**FOR THE TENTH CIRCUIT**

**Christopher M. Wolpert**
**Clerk of Court**

_____

BRENDA EVERS ANDREW,

    Petitioner - Appellant,

v.

SCOTT TINSLEY, Warden, Mabel
Bassett Correctional Center,

    Respondent - Appellee.

---------------------------------------

FAIR TRIAL ANALYSIS, LLC;
OKLAHOMA APPLESEED
CENTER FOR LAW AND JUSTICE;
JAMIE ABRAMS; MARY ATWELL;
VALENA BEETY; SALLY
GOLDFARB; LEIGH GOODMARK;
AYA GRUBER; MALLIKA KAUR;
LEGAL MOMENTUM; NANCY
LEMON; CORTNEY LOLLAR;
MINDY MECHANIC; PRISCILLA
OCEN; AMANDA POTTS; SUSAN
SHARP; WOMEN'S LAW
PROJECT,

    Amicus Curiae.

No. 15-6190

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 5:08-CV-00832-R)**

_____

Nathalie Marie Greenfield, Phillips Black, Inc. Oakland, California (John R. Mills and Meredith Huang, Phillips Black, Inc., Oakland, California, and John T. Carlson, Ridley McGreevy & Winocur, Denver, Colorado, with her on the briefs), for Petitioner-Appellant.

Jennifer L. Crabb, Assistant Attorney General (Gentner F. Drummond, Attorney General, with her on the briefs), Attorney General's Office, State of Oklahoma, Oklahoma City, Oklahoma, for Respondent-Appellee.

Andrew LeGrand, Counsel of Record, Russ Falconer, and Erin Marie Choi, Gibson, Dunn & Crutcher, LLP, Dallas, Texas; Mark J. Cherry, Gibson, Dunn & Crutcher LLP, New York, New York; Monica Limeng Woolley, Hayley N. Lawrence, Maya Jeyendran, and Tate Rosenblatt, Gibson, Dunn & Crutcher LLP, Washington, D.C., filed an amicus curiae brief for Jamie Abrams, Mary Atwell, Valena Beety, Sally Goldfarb, Leigh Goodmark, Aya Gruber, Mallika Kaur, Legal Momentum, Nancy Lemon, Cortney Lollar, Mindy Mechanic, Priscilla Ocen, Amanda Potts, Susan Sharp, Women's Law Project, on behalf of Appellant. Barry C. Edwards, Orlando Florida, filed an amicus curiae brief for Fair Trial Analysis, LLC, in partial support of Appellant and partial support of Appellee.

_____

Before **HARTZ**, **BACHARACH**, and **PHILLIPS**, Circuit Judges.

_____

**BACHARACH**, Circuit Judge.

_____

This appeal grew out of the murder of Mr. Rob Andrew. Suspicion descended on his wife, Ms. Brenda Andrew, who was having an affair with James Pavatt. Mr. Pavatt eventually admitted that he had shot Rob. But the police suspected collusion with Ms. Andrew, and she was eventually convicted and sentenced to (1) death for first-degree murder and (2) 10 years and a $5,000.00 fine for conspiracy to commit first-degree murder. After exhausting her appeals in state court, Ms. Andrew unsuccessfully

2

sought habeas relief in federal district court. She appeals the denial of habeas relief.

We are addressing this appeal for the second time. The first time, Ms. Andrew presented multiple claims. This time, the claims have been winnowed to one: the denial of a fair trial based on evidence of a gender stereotype and promiscuity. The Oklahoma Court of Criminal Appeals rejected this claim, triggering limited review under federal law. With the limited scope of review, we conclude that the Oklahoma Court of Criminal Appeals reasonably applied Supreme Court precedent in deeming the trial fundamentally fair.

**1.    The issues have narrowed.**

When we addressed the appeal the first time, we considered ten claims, including

- improper introduction of sexual evidence,

- exclusion of defense witnesses,

- violation of *Miranda*, and

- cumulative error.

*Andrew v. White*, 62 F.4th 1299, 1309–10 (10th Cir. 2023) (listing the ten issues that Ms. Andrew had raised and we considered), *judgment vacated*, 604 U.S. 86 (2025). A majority of the panel rejected all of the claims. Ms. Andrew obtained certiorari, and the Supreme Court addressed only the claim involving sexual evidence.

With this focus on the claim involving sexual evidence, the Supreme Court vacated our judgment and remanded the case. But the Court didn't vacate the majority opinion. So we directed the parties to address the impact of the remand.

Ms. Andrew responded by reurging her claim of an unfair trial based on the introduction of sexual evidence. But she didn't assert constitutional violations based on the exclusion of testimony, a violation of *Miranda*, or the existence of cumulative error. Instead, Ms. Andrew argued only that the court could consider these alleged violations when assessing prejudice from the sexual evidence. The parties' arguments on remand constrain our review. *See Greenlaw v. United States*, 554 U.S. 237, 243 (2008) (stating that "we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present").

For this review, the parties agree that federal law bars the availability of habeas relief unless the Oklahoma Court of Criminal Appeals

- unreasonably applied Supreme Court precedent involving the denial of a fundamentally fair trial or

- based the decision on an unreasonable determination of fact.

28 U.S.C. § 2254(d)(1)–(2). We apply this standard based solely on the introduction of sexual evidence.

4

**2.      Ms. Andrew challenges a wide range of evidence.**

In supplemental briefing after remand, Ms. Andrew challenges the introduction of "sex-stereotyping evidence." Appellant's Supp. Opening Br. at 19–20 (Apr. 7, 2025). This evidence concerns Ms. Andrew's sex life, appearance, and demeanor.

**Ms. Andrew's sex life**. The sexual evidence includes Ms. Andrew's affairs with James Higgins and Rick Nunley. Both men testified about these affairs. For example, Mr. Higgins testified about how Ms. Andrew had flirted and discussed their sexual interludes.[1]

Ms. Andrew also points to testimony about her affair with James Pavatt. This testimony came from three ministers and a neighbor who had seen Mr. Pavatt holding his face within inches of Ms. Andrew's.

Finally, the government presented an excerpt from Rob's journal, which discusses Ms. Andrew's alleged infidelity during their engagement.

**Ms. Andrew's appearance and demeanor.** The evidence also includes testimony by five persons about Ms. Andrew's provocative clothing and hair style. Mr. Higgins testified that Ms. Andrew had "dressed sexy" with "short skirt[s], low-cut tops, just sexy outfits, provocative." Trial Trans. vol. 2, at 247. Mr. Higgins added that Ms. Andrew had made

---

[1]      Mr. Higgins also testified that Ms. Andrew had told him that she hated Rob and wished he were dead so that she could go on with her life. Trial Trans. vol. 2, at 250, 256.

advances on his sons. Besides Mr. Higgins, a babysitter recalled that Ms. Andrew had once left her house with rolled hair and revealing clothes. Another witness testified that Ms. Andrew had entered a restaurant wearing a "very tight" dress exposing a lot of cleavage, with "[v]ery Gothic, long black hair," leading someone to call her a "hoochie." *Id.* at 320–24. Still another witness recalled that

- Ms. Andrew had asked a woman what hair color her husband preferred,

- the woman answered that her husband liked red hair, and

- Ms. Andrew then dyed her hair red.

Ms. Andrew identifies other evidence about her demeanor. For example, ministers testified that Ms. Andrew had

- used "foul" language and name calling when speaking with Rob and

- engaged in "inappropriate behavior" with Mr. Pavatt.

*Id.* at 211. Similarly, a neighbor testified that the Andrew family had a hot tub and that Ms. Andrew might have used the hot tub for skinny-dipping. *Id.* vol. 12, at 2848.

**3.    Ms. Andrew also challenges the prosecution's statements about her sex life and parental shortcomings.**

Ms. Andrew also contests the fairness of the trial based on the prosecution's statements to the jury.

6

Some of these statements came in the guilt phase. In its opening statement, for example, the prosecution told that jury that "this case is about a controlling wife." *Id.* vol. 1, at 12. In closing argument, the prosecution discussed Ms. Andrew's sex life and demeanor, calling her "an attractive woman" who had cheated with Mr. Pavatt for months and who had "failed to express sorrow when questioned by the police after the shooting." *Id.* vol. 17, at 3903. The prosecution then displayed a pair of underwear from a suitcase that Ms. Andrew had taken to Mexico, asking if a "grieving widow" would wear "this." *Id.* at 4101. The prosecutor added that Ms. Andrew must have been a "slut puppy" because she was sleeping with a married man. *Id.* at 4125.

During closing argument in the sentencing phase, the prosecution discussed Ms. Andrew's character and demeanor. There a prosecutor said that Ms. Andrew was "different," had people "under [her] spell," and was a poor mother. *Id.*, vol. 19, at 4312–14, 4410–11, 4493.

**4.    We assume for the sake of argument that Ms. Andrew has exhausted her claim.**

To obtain federal habeas relief, Ms. Andrew must show that she exhausted the remedies that were available in state court. 28 U.S.C. § 2254(b)(1)(A). But a federal district court can deny habeas relief on the merits without deciding the issue of exhaustion. *See* 28 U.S.C. § 2254(b)(2); *see also Williams v. Trammell*, 782 F.3d 1184, 1194 (10th

7

Cir. 2015) (assuming that a claim was unexhausted and denying relief on the merits). We take this approach, assuming for the sake of argument that Ms. Andrew exhausted her claim.

5. **The federal district court could grant habeas relief only if the Oklahoma Court of Criminal Appeals had failed to reasonably apply Supreme Court precedent.**

Ms. Andrew claimed the denial of a fair trial, and the federal district court rejected the claim. *Andrew v. Moham*, No. CIV–08–832–R, 2015 WL 5254525, at **14–19 (W.D. Okla. Sept. 9, 2015), *aff'd sub nom.*, *Andrew v. White*, 62 F.4th 1299, 1312–16 (10th Cir. 2023), *judgment vacated*, 604 U.S. 86 (2025). We engage in de novo review over the federal district court's legal analysis. *See Littlejohn v. Trammell*, 704 F.3d 817, 825 (10th Cir. 2013) (applying the same deferential standard as the district court when the state appellate court had adjudicated the claim on the merits).

After the claim was rejected in state court, the federal district court could reach the merits only if the state appellate court's decision had been

- contrary to, or involving an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

- based on an unreasonable determination of the facts given the evidence presented in state court.

28 U.S.C. § 2254(d); *Andrew v. White*, 604 U.S. 86, 92 (2025) (per curiam).[2]

For legal issues, we conduct a two-step process. *Budder v. Addison*, 851 F.3d 1047, 1051–52 (10th Cir. 2017). We first determine what the Supreme Court has clearly established as federal law. *Williams v. Taylor*, 529 U.S. 362, 379–82 (2000). "[C]learly established Federal law . . . is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003) (internal quotation marks omitted). We then ask whether the state court's decision was contrary to, or involved an unreasonable application of, the clearly established federal law. *Frost v. Pryor*, 749 F.3d 1212, 1223 (10th Cir. 2014). It's not enough for the state court to be wrong; it must be so wrong that no fair-minded jurist would agree with the state court. *Id.*

For the state court's factual findings, we consider whether "the state court[] plainly misapprehend[ed] or misstate[d] the record in making [its] findings, and the misapprehension goes to a material factual issue that is central to [the] petitioner's claim." *Ryder ex rel. Ryder v. Warrior*, 810 F.3d 724, 739 (10th Cir. 2016) (quoting *Byrd v. Workman,* 645 F.3d 1159,

---

[2]    Ms. Andrew acknowledges the applicability of these restrictions on habeas relief. *See* Appellant's Supp. Resp. Br. at 20 (stating that 28 U.S.C. § 2254(d) applies).

1171–72 (10th Cir. 2011)). To overcome the state appellate court's factual findings, the petitioner must show that they are objectively unreasonable. *Smith v. Aldridge*, 904 F.3d 874, 880 (10th Cir. 2018).

If the state's highest court acted unreasonably in applying Supreme Court precedent or in finding facts, we would need to decide whether the conviction or sentence had violated the Constitution. *See Fry v. Pliler*, 551 U.S. 112, 119 (2007) (stating that 28 U.S.C. § 2254(d) provides "precondition[s] to the grant of habeas relief . . . , not an entitlement to it"); *Hancock v. Trammell*, 798 F.3d 1002, 1010 (10th Cir. 2015) ("[E]ven when petitioners satisfy the threshold in § 2254(d), they must establish a violation of federal law or the federal constitution.").

**6.    Ms. Andrew didn't preserve her challenge to the state appellate court's fact-finding.**

In her supplemental briefs, Ms. Andrew argues that the Oklahoma Court of Criminal Appeals acted unreasonably twice in its factual findings:

1.    In referring to Ms. Andrew's affair with Mr. Rick Nunley, the court stated that "[e]vidence of their affair [had been] limited to one question during [Mr. Nunley's] testimony."

2.    The court also stated that Ms. Andrew had told Mr. Nunley that she hated Rob and wished he was dead.

*Andrew v. State*, 164 P.3d 176, 192 (Okla. Crim. App. 2007).

But Ms. Andrew admittedly failed to present these arguments in district court. *See* Appellant's Supp. Resp. Br. at 4 n.3 (acknowledging that

"§ 2254(d)(2) was not raised in the District Court as a basis for granting relief on the relevant claims"). As a result, Ms. Andrew forfeited or waived this argument. *See Harris v. Sharp*, 941 F.3d 962, 975 (10th Cir. 2019) ("Even in habeas cases involving the death penalty, we consider arguments forfeited or waived when they are raised for the first time on appeal.").

Ms. Andrew suggests that the preservation issue was waived when she presented this argument in her opening appellate brief and the respondent failed to object. Appellant's Supp. Resp. Br. at 4 n.3. This suggestion is misguided. Ms. Andrew doesn't say where in her opening brief she had mentioned § 2254(d)(2). In fact, this section isn't cited anywhere in her opening appellate brief.

She did say in a footnote: "Incidentally, the [Oklahoma Court of Criminal Appeals] misstated the record with respect to [Mr.] Nunley. It said evidence of his 'sexual affair' with Andrew 'was limited to one question during his testimony.' In fact, there were 10 such questions . . . ." Appellant's Opening Br. at 26 n.2. This "incidental" observation in a footnote didn't fairly alert either the respondent or the panel to an argument involving § 2254(d)(2). So neither the respondent nor the panel ever addressed an argument under § 2254(d)(2).

As a fall-back position, Ms. Andrew says in a footnote that we "should address" the argument under § 2254(d)(2) as "an issue of plain error." Appellant's Supp. Resp. Br. at 4 n.3. But this footnote doesn't say

11

how the alleged factual mistake would satisfy the plain-error standard. This failure triggers a waiver because the single sentence in Ms. Andrew's footnote does not adequately develop an argument for plain error. *See Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016) ("A party's offhand reference to an issue in a footnote, without citation to legal authority or reasoned argument, is insufficient to present the issue for our consideration."). Given the waiver, we decline to consider the possibility of plain error. *See Hancock v. Trammell*, 798 F.3d 1002, 1011 (10th Cir. 2015) (declining to consider a forfeited argument when the appellant in a capital habeas case failed to urge plain error).

**7.    A fair-minded jurist could reject Ms. Andrew's claim as to the guilt phase.**

In considering Ms. Andrew's claim, we apply the clearly established prohibition of "evidence so unduly prejudicial as to render a criminal trial fundamentally unfair." *Andrew v. White* 604 U.S. 86, 96 (2025) (per curiam). We first apply this prohibition to the guilt phase, addressing the relevance of the challenged evidence, the degree of prejudice from the improper evidence, and any mitigating instructions. *See id.*

**A.    The Oklahoma Court of Criminal Appeals had leeway on the issue.**

We must determine "whether a fair-minded jurist reviewing this record could disagree with [Ms.] Andrew that the trial court's mistaken admission of irrelevant evidence was so 'unduly prejudicial' as to render

12

her trial 'fundamentally unfair.'" *Id.* (quoting *Payne v. Tennessee*, 501 U.S. 808, 825 (1991)); *see also Martinez v. Quick*, 134 F.4th 1046, 1065 (10th Cir. 2025) (applying this standard and concluding that "a fairminded jurist could (and perhaps would) disagree with [the petitioner's] view that the inadvertent introduction of [a] racial slur rendered his sentencing fundamentally unfair"), *petition for cert. filed* (U.S. Sept. 15, 2025). To predict what a fair-minded jurist might decide, we consider the specificity of the Supreme Court's rule. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004); *Graham v. White*, 101 F.4th 1199, 1208 (10th Cir. 2024). "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough*, 541 U.S. at 664.

Given the generality of the rule on fundamental fairness, we afford considerable leeway to the state appellate courts. *See Keahey v. Marquis*, 978 F.3d 474, 479 (6th Cir. 2020) (concluding that a state court had considerable leeway because the right of a criminal defendant to fundamental fairness lacks specificity); *see also Graham*, 101 F.4th at 1208 (stating that we give leeway to the state appeals court when applying a general Supreme Court rule on the arbitrariness of a state court's decision). So the Oklahoma Court of Criminal Appeals had "broad discretion" when deciding the issue. *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003).

13

**B.** **We consider only the arguments that Ms. Andrew presented in the Oklahoma Court of Criminal Appeals.**

We review the reasonableness of a state court's ruling "in light of the arguments the petitioner raised in the state court." *Wellmon v. Colo. Dep't of Corr.*, 952 F.3d 1242, 1249 (10th Cir. 2020); *see also Menzies v. Powell*, 52 F.4th 1178, 1201 (10th Cir. 2022) ("We review the reasonableness of the [state supreme court's] decision based on the arguments presented."). For example, we "do not expect state courts to address arguments the parties do not raise." *Wellmon*, 952 F.3d at 1249.

In her arguments to the Oklahoma Court of Criminal Appeals, Ms. Andrew relied on ten testimonial passages:

1. testimony from Tracy Higgins and Rick Nunley about sexual affairs with Ms. Andrew,

2. testimony that Rob had suspected an affair between Ms. Andrew and Mr. Nunley,

3. testimony that Rob had noticed Mr. Nunley and Ms. Andrew spending a lot of time together,

4. testimony about Ms. Andrew's advances to Mr. Higgins's sons,

5. testimony about a dinner where Ms. Andrew had worn revealing clothing,

6. testimony that someone had referred to Ms. Andrew as a "hoochie,"

7. testimony that a woman had said her husband liked red hair on women and that Ms. Andrew then dyed her hair red,

14

8.      testimony that Ms. Andrew had lied to Mr. Pavatt when stating that she had not slept with any men other than Mr. Pavatt and Rob,

9.      testimony that Mr. Pavatt had stated that Ms. Andrew's children were "well-trained" to hide the couple's affair, and

10.      testimony by a minister about Ms. Andrew's demeanor when she was planning Rob's funeral.

Appellant's Opening Br. at 29, 38–42, 66–67, Case No. D-2004-1010 (Okla. Crim. App. Feb. 21, 2006). In addition to this testimony, Ms. Andrew points to the prosecution's argument about the underwear found in her luggage. *See* Trial Trans. vol. 17, at 4103 (stating that a "grieving widow . . . doesn't pack her thong underwear and run off with her boyfriend").

In our appeal, Ms. Andrew challenges the introduction of evidence that she didn't challenge in the state-court appeal. In the state-court appeal, for example, she didn't mention evidence about

- her use of "foul" language,

- her skinny-dipping in a hot tub,

- Mr. Pavatt's holding his face within inches of Ms. Andrew's,

- Ms. Andrew's relationship with another man in college,

- Ms. Andrew's attractiveness,

- her blank demeanor when questioned at the police station, or

- characterization of her as a "slut puppy."

15

The Oklahoma Court of Criminal Appeals relies on the evidence identified by the parties rather than search the record to find support for a defendant's claim. *Cuesta-Rodriguez v. State*, 247 P.3d 1192, 1197 (Okla. Crim. App. 2011). We can't fault the Oklahoma court for this approach because we do the same thing. *United States v. Rodriguez-Aguirre*, 108 F.3d 1228, 1237 n.8 (10th Cir. 1997). So the Oklahoma Court of Criminal Appeals didn't act unreasonably by disregarding evidence that Ms. Andrew hadn't addressed. *See Wellmon v. Colo. Dep't of Corr.*, 952 F.3d 1242, 1249–50 (10th Cir. 2020) (concluding that the state appeals court reached a reasonable decision based on the arguments presented there).

**C.    Some of the sexual evidence was irrelevant.**

Given the Supreme Court's directions on remand, we revisit the relevance of the State's evidence involving Ms. Andrew's sexual conduct. *See Andrew v. White*, 604 U.S. 86, 96 (2025) (per curiam) (instructing our court to consider the relevance of the disputed evidence to the charges and sentencing factors). Ordinarily, we're bound by a state court's determinations of relevance under a state evidence code. *See DeLozier v. Sirmons*, 531 F.3d 1306, 1323 (10th Cir. 2008) (stating that we're bound in habeas review based on the Oklahoma Court of Criminal Appeals' evaluation of admissibility under state law); *see also* Okla. Stat. tit. 12, §§ 2401–02 (stating the standard for relevant evidence); Okla. Stat. tit. 12

16

§ 2103 (stating that the Oklahoma Rules of Evidence apply in criminal cases as well as in civil cases).

But Ms. Andrew argues that the introduction of irrelevant evidence deprived her of a fundamentally fair trial. We thus reconsider the relevance of the evidence despite the Oklahoma Court of Criminal Appeals' assessment under state law. *See Spears v. Mullin*, 343 F.3d 1215, 1227–28 (10th Cir. 2003) (disagreeing with the Oklahoma Court of Criminal Appeals on the relevance of evidence when assessing the fundamental fairness of a sentencing); *see also Lesko v. Owens*, 881 F.2d 44, 51 (3d Cir. 1989) (concluding that "the erroneous admission of evidence that is relevant [under state law], but excessively inflammatory, might rise to the level of a constitutional violation").[3]

---

[3]     A potential issue exists as to our level of scrutiny over the state appellate court's conclusions on relevance. On the one hand, relevance is a condition of admissibility. Okla. Stat. tit. 12, § 2402. So we follow the state appellate court's determinations regarding relevance as a condition of admissibility. *See Boyd v. Ward*, 179 F.3d 904, 912 (10th Cir.1999) ("[W]e defer to state court determinations of state law."). On the other hand, relevance bears on our due process inquiry, which addresses fundamental fairness as a matter of federal law. *See Martinez v. Quick*, 134 F.4th 1046, 1064–65 (10th Cir. 2025) (applying the "due-process principle that the admission of irrelevant evidence can render a trial fundamentally unfair"); *Hooks v. Workman*, 689 F.3d 1148, 1182 (10th Cir. 2012) (discussing "fundamental fairness safeguarded by federal law").

In this case, we need not decide the required level of scrutiny over the state appellate court's determinations of relevance. We instead assume for the sake of argument that we should independently assess relevance when considering the federal claim involving the denial of a fair trial.

17

The Oklahoma Court of Criminal Appeals acknowledged that much of the challenged evidence had been irrelevant to guilt or innocence. *Andrew v. State*, 164 P.3d 176, 192 (Okla. Crim. App. 2007). That irrelevant evidence included testimony that Ms. Andrew "had 'come on to' [Mr. Higgins's] two adult sons," that Ms. Andrew had dressed provocatively when dining, that someone at a restaurant had called her a "hoochie," and that Ms. Andrew had changed her hair color to match a man's preference. *Id.* We agree with the state court's assessment of this evidence as irrelevant. For example, Ms. Andrew's provocative appearance and flirtatious behavior couldn't rationally bear on whether she had plotted to kill her husband. *See United States v. McFadyen-Snider*, 552 F.2d 1178, 1181–82 (6th Cir. 1977) (concluding that "[e]vidence of illicit sexual activities is totally immaterial to the credibility or character traits involved in most criminal cases" (quoting *United States v. Cox*, 536 F.2d 65, 71 (5th Cir. 1976))).

But the Oklahoma Court of Criminal Appeals also regarded other evidence of sexual conduct as relevant. That evidence had addressed

- Ms. Andrew's affairs with Mr. Higgins and Mr. Nunley,

- thong underwear found in Ms. Andrew's luggage in Mexico, and

- her "flat, cold, and unemotional" demeanor after the murder.

18

*Andrew v. State*, 164 P.3d 176, 192–94 (Okla. Crim. App. 2007). In the Oklahoma court's view, evidence about the affairs was pertinent to motive and intent, the thong underwear showed "the extent and the nature of the relationship between Mr. Pavatt and [Ms. Andrew] . . . and their intentions in fleeing to Mexico, and the demeanor showed "a consciousness of guilt." *Id.* at 192–94.

We agree that evidence of demeanor could bear on guilt. But we may assume for the sake of argument that the court had misgauged the relevance of (1) Ms. Andrew's affairs with Mr. Nunley and Mr. Higgins and (2) the thong underwear found in her luggage. *See Spears v. Mullin*, 343 F.3d 1215, 1228 (10th Cir. 2003) (concluding that photographs had not been relevant because they did not "support, clarify, or illustrate" other testimony related to the prosecution's theory).

**D.    The properly admitted evidence was overwhelming.**

In assessing Ms. Andrew's claim, we consider not only the relevance of the sexual evidence but also the prejudice. *See Andrew v. White*, 604 U.S. 86, 96 (2025) (per curiam) (instructing us to consider "the degree of prejudice [Ms. Andrew] suffered" from the introduction of the disputed evidence). In considering the prejudice, we examine the strength of the evidence of guilt. *See Le v. Mullin*, 311 F.3d 1002, 1013 (10th Cir. 2002) ("Inquiry into fundamental fairness requires examination of the entire proceedings, including the strength of the evidence against the petitioner,

19

both as to guilt at that stage of the trial and as to moral culpability at the sentencing phase."); *Thornburg v. Mullin,* 422 F.3d 1113, 1125 (10th Cir. 2005) (rejecting an argument that the admission of evidence had violated the right to a fair trial when "the evidence of guilt could reasonably be viewed as overwhelming"). "Where evidence against a defendant is strong, the likelihood that erroneously admitted evidence will have an unduly prejudicial impact is lessened." *Johnson v. Martin*, 3 F.4th 1210, 1231 (10th Cir. 2021).

In the prior panel opinion, the majority concluded that a reasonable jurist could find "overwhelming evidence of Ms. Andrew's guilt." *Andrew v. White*, 62 F.4th 1299, 1319–20 (10th Cir. 2023), *judgment vacated*, 604 U.S. 86 (2025).[4] For this conclusion, the majority referred to the state appellate court's extensive summary of the underlying facts, together with 24 other pieces of evidence:

1. Ms. Andrew had stated that she

   - wished Rob were dead so that she could proceed with her life and get his life-insurance money,

   - "would see him dead," Trial Trans. vol. 3, at 607, and

---

[4]    In her supplemental response brief, Ms. Andrew tries to counter the State's evidence based on her claims involving a violation of *Miranda*, the exclusion of defense witnesses, and the existence of cumulative error. Appellant's Supp. Resp. Br. at 14, 19. But the Supreme Court's opinion did not address these claims and Ms. Andrew hasn't argued that they remain viable on remand. *See* Part 1, above.

- would kill Rob or have him killed,

2. Ms. Andrew had told Mr. Higgins that she had hated Rob "and wished that she didn't have to stay with him," *id*. vol. 2, at 250,

3. Ms. Andrew had asked Mr. Pavatt whether he would kill Rob or if he knew someone who would commit the killing,

4. Rob had repeatedly expressed fear that he would be killed by Ms. Andrew and Mr. Pavatt for life insurance benefits,

5. Ms. Andrew and Mr. Pavatt had tried to murder Rob by cutting his car's brake lines and luring him to a hospital,

6. Ms. Andrew and Mr. Pavatt had forged Rob's signature to get ownership of his life-insurance policy,

7. Ms. Andrew had directed Mr. Pavatt to track Rob in the month leading to his murder,

8. Ms. Andrew had said the night before the murder that she hated Rob,

9. Ms. Andrew had been unusually calm at the crime scene and in the hours following the murder,

10. Ms. Andrew and Mr. Pavatt had giggled together at the hospital the morning after the murder,

11. the Andrews children had been watching television at a loud volume when the shooting took place even though they were supposed to be preparing to leave with Rob,

12. expert witnesses for both sides testified that the shot to Ms. Andrew's arm had been staged to make it look like she was the victim,

13. an expert witness contradicted Ms. Andrew's account by testifying that she had been shot in the arm from two to four inches away,

21

14. Ms. Andrew had refused to return a 16-gauge shotgun to Rob,

15. Ms. Andrew had used a target range 8 days before the shooting and left behind 16-gauge shotgun shells,

16. Rob had been killed by two 16-gauge shotgun blasts,

17. a spent 16-gauge shotgun shell was found on top of the Andrews' van in the garage and the other spent shell had been found in a neighbor's bedroom,

18. the same 16-gauge shotgun had fired the spent shells found on the van in the garage and in the neighbor's bedroom,

19. Mr. Pavatt had bought a .22 handgun, and .22 caliber rounds were found in a nearby house accessible to Ms. Andrew,

20. Ms. Andrew had been shot with a .22 caliber handgun, and the shell from that gun had been recovered at the crime scene,

21. the police had found three .22 caliber rounds in the attic and a spare bedroom in a nearby home that Ms. Andrew had been asked to watch while the owners were out of town,

22. the neighbors' home and a car belonging to Mr. Pavatt's daughter had contained the same brand of .22 ammunition and that ammunition was consistent with what had been used to shoot Ms. Andrew,

23. Ms. Andrew had shown disinterest in planning her husband's funeral and said there was nothing about Rob that she loved, *id.* vol. 11, at 2582, and

24. Ms. Andrew had fled to Mexico with Mr. Pavatt and her children before Rob's funeral.

*Andrew v. White*, 62 F.4th 1299, 1306–09, 1319–21 (10th Cir. 2023),

*judgment vacated*, 604 U.S. 86 (2025). On remand, Ms. Andrew hasn't

challenged the existence or strength of this evidence of guilt.[5]

### E.    The alleged stereotyping didn't concern the central jury issues.

Ms. Andrew argues that the trial was fundamentally unfair, relying

on federal courts' recognition of the prejudicial effects of stereotyping. For

support, she points to a Supreme Court opinion concerning racial

stereotypes injected into capital proceedings: *Buck v. Davis*, 580 U.S. 100,

119–122, 128 (2017).

In *Buck*, a psychologist testified during the sentencing phase of a

trial for a Black defendant that

- race was a "factor[] . . . known to predict future dangerousness" and

---

[5]    Ms. Andrew states that the parties "agree that her conviction must be set aside even if there was overwhelming evidence of guilt, if the evidence offered was unduly prejudicial." Appellant's Supp. Resp. Br. at 12 n.10. For this alleged agreement, Ms. Andrew points to a statement of the respondent's counsel in the first oral argument. There we posed a hypothetical question to counsel: In a case involving "a really strong case for guilt," would there be a limit to the amount of "inadmissible . . . harmful, [and] irrelevant" evidence that could be introduced without depriving a defendant of a fundamentally fair trial?" Oral Arg. 39:36–40:03 (July 27, 2017). The respondent's counsel acknowledged that this possibility could exist in a hypothetical case, but clarified that the sexual evidence against Ms. Andrew did not rise to that level. *Id.* at 40:04–24.

Ms. Andrew apparently misunderstands the respondent's position: The respondent's counsel did not agree that the evidence of guilt should be disregarded in assessing the fundamental fairness of the trial.

- "the race factor, black, increases the future dangerousness for various complicated reasons."

580 U.S. at 107–08 (internal quotation marks & citations omitted). In closing argument, the prosecutor referred to the psychologist's testimony, telling the jury that it had "heard from [the psychologist] . . . who told you that . . . the probability did exist that [the defendant] would be a continuing threat to society." *Id.* at 108.

The Supreme Court concluded that the defendant had shown prejudice from the psychologist's testimony. *Id.* at 119–20. The testimony appealed to a powerful racial stereotype—that Black men were prone to violence. *Id.* at 121. That stereotype "coincided precisely with the central question at sentencing": Whether the defendant posed a continuing threat. *Id.* The prejudice was not cured by the infrequency of the racial references: "[W]hen a jury hears expert testimony that expressly makes a defendant's race directly pertinent on the question of life or death, the impact of that evidence cannot be measured simply by how much air time it received at trial or how many pages it occupies in the record." *Id.* at 121–122.

In contrast, the alleged effort to stereotype Ms. Andrew did not "coincide[] precisely with the central question" before the jury. *Id.* at 121. Here, for example, the prosecution argued that Ms. Andrew had conspired with Mr. Pavatt to murder Rob. In response, Ms. Andrew argued that

Mr. Pavatt had unilaterally committed the murder to prevent a reconciliation. Trial Trans. vol. 17, at 3943–63, 4011–4013.

To resolve this dispute, the jury needed to weigh the evidence, including Ms. Andrew's statements about her feelings toward Rob, her interactions with Mr. Pavatt in the runup to the murder, the efforts to obtain the insurance proceeds, the cutting of Rob's brake lines, the forensic materials gathered from the crime scene, Ms. Andrew's demeanor after the murder, and her flight to Mexico.

In the closing argument in the guilt phase, the prosecution asked the jury to consider that evidence. *Id.* at 3860–61, 3891–92 (evidence of the flight to Mexico); *id.* at 3862–68, 3875–76, 4108–11 (evidence that Ms. Andrew hated Rob and didn't want to reconcile with him); *id.* at 3873 (evidence of Ms. Andrew's demeanor after the murder); *id.* at 3880–81, 3895–96 (forensic evidence); *id.* at 3893–94, 4047–58 (evidence of efforts to obtain insurance proceeds); *id.* at 4043–45 (evidence of phone calls between Ms. Andrew and Mr. Pavatt on the day that the brake lines were cut and the following day); *id.* at 4114–17 (evidence about the discovery of a shotgun shell from the murder weapon in a nearby house accessible to Ms. Andrew).

The prosecutor did mention the evidence of Ms. Andrew's affairs with Mr. Higgins and Mr. Nunley, *id.* at 4122–23, and told the jury that the underwear in Ms. Andrew's luggage hadn't suggested that she was a

25

grieving widow, *id.* at 4101, 4103. But that evidence did not "coincide precisely" with "the central question" for the jury—whether Ms. Andrew had conspired with Mr. Pavatt to commit the murder.

Ms. Andrew also relies on *Bennett v. Stirling*, 842 F.3d 319 (4th Cir. 2016). There the prosecutor

- told an all-white jury that "[m]eeting the [Black offender] again will be like meeting King Kong on a bad day" and

- called the offender a "caveman," a "mountain man," a "monster," a "big old tiger," and "[t]he beast of burden."

*Id.* at 321. In addition, a witness described a dream from his hospital stay involving a chase "by murderous, black Indians." *Id.* at 321, 326. The Fourth Circuit concluded that the prosecutor's use of racial prejudice had rendered the trial unfair. *Id.* at 327–28..

*Bennett* doesn't suggest a constitutional violation here. In *Bennett*, the Fourth Circuit concluded that the prosecutor's racist comments had "risked reducing [the defendant] to his race" and impaired the jurors' ability to "'focus their collective judgment on the unique characteristics of a particular criminal defendant.'" *Id.* at 325 (quoting *McCleskey v. Kemp*, 481 U.S. 279, 311 (1987)). Ms. Andrew has not shown that the challenged evidence and argument would have created a similar stereotype involving a propensity to murder.

We thus conclude that the alleged stereotyping did not substantially undermine the fundamental fairness of the trial.

**F.    The lack of a mitigating instruction does not show that the trial was fundamentally unfair.**

Finally, we consider "whether the trial court provided any mitigating instructions." *Andrew v. White*, 604 U.S. 86, 96 (2025) (per curiam).

At trial, Ms. Andrew requested an instruction that would have prohibited the jury from considering evidence of other misconduct. Trial Trans. vol. 16, at 3835–36. The trial court declined to give this instruction. Ms. Andrew appealed this ruling, and the state appellate court concluded that the failure to give a limiting instruction had constituted harmless error. *Andrew v. State*, 164 P.3d 176, 201 (Okla. Crim App. 2007).

In our view, the failure to give this instruction did not prevent a reasonable jurist from concluding that the trial been fundamentally fair. Though the instruction might have tempered the risk of reliance on irrelevant sexual evidence, the jury had overwhelming evidence of guilt unrelated to Ms. Andrew's sexual conduct. *See United States v. Esparsen*, 930 F.2d 1461, 1476 (10th Cir. 1991) (concluding that a refusal to give an instruction limiting consideration of other crimes, wrongs, or acts had been harmless given the substantial evidence of guilt).

Following the Supreme Court's instructions, we have considered the relevance of the evidence challenged by Ms. Andrew, the degree of prejudice to her, and the trial court's failure to provide mitigating instructions about the evidence. We conclude that a fair-minded jurist

27

could doubt infection of the trial "with unfairness." *See Andrew v. White*, 604 U.S. 86, 96 (2025) (per curiam) (internal quotation marks & citation omitted). As a result, we uphold the denial of habeas relief at the guilt stage.

**8.     A fair-minded jurist could also reject Ms. Andrew's challenge as to the sentencing phase.**

Ms. Andrew also challenges the fairness of her sentencing proceeding. For this challenge, we assess the reasonableness of the state appellate court's decision based on the arguments presented there. *See Wellmon v. Colo. Dep't of Corr.*, 952 F.3d 1242, 1249 (10th Cir. 2020).

In the state-court appeal, Ms. Andrew pointed to the prosecution's closing argument at the sentencing phase, insisting that Ms. Andrew had been a poor mother because she brought men into the home while the children were there. Trial Trans. vol. 19, at 4394. Ms. Andrew characterized this argument as "an inflammatory, derogatory, and prejudicial attack" based on "an antiquated belief about the appropriate behavior of women." Appellant's Opening Br. at 97, Case No. D-2004-1010 (Okla. Crim. App. Feb. 21, 2006) (internal quotation marks & citation omitted).

But Ms. Andrew didn't question some of the prosecution's arguments that she challenges now. For example, in state court, Ms. Andrew didn't question the prosecutor's statements that Ms. Andrew

28

- had people "under her spell,"

- was "not like you and me,"

- had not shown any emotion, or remorse, or grief, and

- had "deserve[d] that different kind of punishment that's reserved for people exactly like her."

Trial Trans. vol 19, at 4410–11, 4493–94. So we will not consider those statements when determining whether the Oklahoma Court of Criminal Appeals acted reasonably in assessing the fairness of the sentencing stage.

We assume for the sake of argument that the evidence of Ms. Andrew's affairs with Mr. Higgins and Mr. Nunley hadn't been relevant. *See* p. 19, above. But the other evidence supported two aggravating factors:

1. Ms. Andrew committed the murder for remuneration or the promise of remuneration or employed someone else to commit the murder for remuneration or the promise of remuneration.

2. The murder was especially heinous, atrocious, or cruel.

*See* Okla. Stat tit. 21 § 701.12(3)–(4).

In the state-court appeal, Ms. Andrew challenged the sufficiency of the evidence on the second aggravating factor (a killing that had been heinous, atrocious and cruel). But the state appellate court rejected this challenge, concluding that the evidence had "tend[ed] to show that Rob . . . [had] suffered serious physical abuse, and [had been] conscious of the fatal

29

attack for several minutes." *Andrew v. State*, 164 P.3d 176, 201 (Okla. Crim. App. 2007). Ms. Andrew doesn't challenge that conclusion.

For the murder-for-renumeration aggravator, Ms. Andrew challenged the trial court's refusal to give her proposed instruction. The Oklahoma Court of Criminal Appeals rejected this challenge, concluding that (1) the proposed instruction hadn't accurately stated the law and (2) the actual instruction had been correct. *Id.* at 201–02. Ms. Andrew doesn't challenge these rulings or question the strength of the evidentiary support for the aggravator.

Despite the strong evidentiary support for these aggravating factors, Ms. Andrew argues that the irrelevant evidence and arguments had infected the sentencing phase. But Ms. Andrew hasn't shown that the challenged evidence and arguments "coincided precisely with the central question[s] at sentencing" or the use of prohibited grounds to decide between life or death. *See Buck v. Davis*, 580 U.S. 100, 121 (2017). For example, evidence of Ms. Andrew's affairs, appearance, and failure to conform to conventional gender roles wouldn't appear to affect the jury's consideration of Rob's consciousness after the shooting or the existence of a financial motive.

The prosecution did characterize Ms. Andrew as a poor mother, and this characterization concerned a sentencing issue. But Ms. Andrew had injected this issue by arguing that she was a good mother. Trial Trans.

vol. 19, at 4179 (defense argument to the jury that Ms. Andrew was "a good mother who love[d] her children very much, and the death penalty would deprive [her children] of their only remaining living parent"). Given Ms. Andrew's argument, a fair-minded jurist could reject her allegation of unfair prejudice.

As with the guilt phase of the trial, we have considered the relevance of the evidence challenged by Ms. Andrew, the degree of prejudice that she suffered from its introduction, and the trial court's failure to provide mitigating instructions about the evidence. We conclude that a fair-minded jurist could reasonably conclude that the challenged evidence hadn't infected the sentencing proceedings.[6]

\* \* \*

---

[6]   Ms. Andrew submitted a decision of the Inter-American Commission on Human Rights, which concluded that the introduction of sexualized evidence had violated Ms. Andrew's human rights. But the Commission's decision is not binding here. *See Tamayo v Stephens*, 740 F.3d 991, 997 (5th Cir. 2014) (concluding that decisions by the Inter-American Commission on Human Rights are not binding on domestic courts); *Flores-Nova v. Attorney General of U.S.*, 652 F.3d 488, 494 (7th Cir. 2011) (concluding that "[the Inter-American Commission on Human Rights'] advisory opinions are not binding on the United States and, therefore, they are not enforceable domestically"). In addition, the Commission wasn't subject to the statutory restrictions on habeas relief. *See* Part 5, above; *see also Tamayo*, 740 F.3d at 997 (stating that the court could not "address the merits of the [Inter-American Commission on Human Rights] decision by way of a federal habeas").

So we affirm the district court's denial of habeas relief on Ms. Andrew's claim involving fundamental fairness of her trial.

15-6190, *Andrew v. Tinsley*
**PHILLIPS**, J., concurring in the opinion.

I concur in the majority opinion. To assist the reader in understanding the weight of the evidence, I quote the OCCA's findings in its decision, which we incorporated into our earlier majority opinion:

> [Ms. Andrew]'s husband Robert ("Rob") Andrew was shot to death at their Oklahoma City home sometime around 7:00 p.m. on November 20, 2001. [Ms. Andrew] was also shot in the arm during this incident.
>
> The Andrews were separated at the time and Rob Andrew was at the home to pickup [sic] the two minor children for visitation over the Thanksgiving holiday. The custom was that [Ms. Andrew] would bring the children out to the car and Rob would take them from there. However, on this night, [Ms. Andrew] asked Rob Andrew to come into the garage to light the pilot light on the furnace because it had gone out.
>
> [Ms. Andrew]'s version of the events from that point on was that as Rob was trying to light the furnace, two masked men entered the garage. Rob turned to face the men and was shot in the abdomen. He grabbed a bag of aluminum cans to defend himself and was shot again. [Ms. Andrew] was hit during this second shot.
>
> Undisputed facts showed that after that, [Ms. Andrew] called 911 and reported that her husband had been shot. Emergency personnel arrived and found Rob Andrew's body on the floor of the garage; he had suffered extensive blood loss and they were unable to revive him. [Ms. Andrew] had also suffered a superficial gunshot wound to her arm. The Andrew children were found in a bedroom, watching television with the volume turned up very high, oblivious to what had happened in the garage.
>
> [Ms. Andrew] was taken to a local hospital for treatment. Her behavior was described by several witnesses, experienced in dealing with people in traumatic situations, as uncharacteristically calm for a woman whose husband had just been gunned down.
>
> Rob Andrew was shot twice with a shotgun. A spent 16–gauge shotgun shell was found in the garage on top of the family van. Rob Andrew owned a 16–gauge shotgun, but had told several friends that [Ms. Andrew] refused to let him take it when they separated. Rob Andrew's shotgun was missing from

the home. One witness testified to seeing [Ms. Andrew] at an area used for firearm target practice near her family's rural Garfield County home eight days before the murder and he later found several 16–gauge shotgun shells at the site.

[Ms. Andrew]'s superficial wound was caused by a .22 caliber bullet, apparently fired at close range, which was inconsistent with her claim that she was shot at some distance. About a week before the murder, [James] Pavatt purchased a .22 caliber handgun from a local gun shop. Janna Larson, Pavatt's daughter testified that, on the day of the murder, Pavatt borrowed her car and claimed he was going to have it serviced for her. When he returned it the morning after the murder, the car had not been serviced, but Larson found one round of .22 caliber rimfire ammunition on the floorboard. In a conversation later that day, Pavatt told Larson never to repeat that [Ms. Andrew] had asked him to kill Rob Andrew, and he threatened to kill Larson if she did. He also told her to throw away the .22 round she found in her car.

Police searched the home of Dean Gigstad, the Andrews' next-door neighbor, after the Gigstads reported finding suspicious things in their home. Police found evidence that someone had entered the Gigstads' attic through an opening in a bedroom closet. A spent 16 gauge shotgun shell was found on the bedroom floor, and several .22 caliber rounds were found in the attic itself. There were no signs of forced entry into the Gigstad home. Gigstad and his wife were out of town when the murder took place, but [Ms. Andrew] had a key to their home. The .22 caliber round found in Janna Larson's car was of the same brand as the three .22 caliber rounds found in the Gigstads' attic; the .22 caliber bullet fired at [Ms. Andrew] and retrieved from the Andrews' garage appeared consistent with bullets in these unfired rounds. These rounds were capable of being fired from the firearm that Pavatt purchased a few weeks before the murder; further testing was not possible because that gun was never found. The 16 gauge shotgun shell found in the Gigstads' home was of the same brand as the 16 gauge shell found in the Andrews' garage. Ballistics comparison showed similar markings, indicating that they could have been fired from the same weapon. Whether these shells were fired from the 16–gauge shotgun Rob Andrew had left at the home was impossible to confirm because, as noted, that gun remains missing.

Within days after the shooting, before Rob Andrew's funeral, [Ms. Andrew], James Pavatt and the two minor children left the State and crossed the border into Mexico. They were apprehended while attempting to re-enter the United States in late February 2002.

[Ms. Andrew] and Pavatt met while attending the same church. At some

2

point they began teaching a Sunday school class together. [Ms. Andrew] and Pavatt began having a sexual relationship. Around the same time, Pavatt, a life insurance agent, assisted Rob Andrew in setting up a life insurance policy through Prudential worth approximately $800,000. In late September 2001, Rob Andrew moved out of the family home, and [Ms. Andrew] initiated divorce proceedings a short time later.

Janna Larson, Pavatt's adult daughter, testified that in late October, Pavatt told her that [Ms. Andrew] had asked him to murder Rob Andrew. On the night of October 25–26, 2001, someone cut the brake lines on Rob Andrew's automobile. The next morning, Pavatt persuaded his daughter to call Rob Andrew from an untraceable phone and claim that [Ms. Andrew] was at a hospital in Norman, Oklahoma, and needed him immediately. An unknown male also called Rob that morning and made the same plea. Rob Andrew's cell phone records showed that one call came from a pay phone in Norman (near Larson's workplace), and the other from a pay phone in south Oklahoma City. Rob Andrew discovered the tampering to his car before placing himself in any danger. He then notified the police. The next day, [Ms. Andrew] told Rob that she read in the newspaper that someone cut his brakes, but no media coverage of this event had occurred.

One contentious issue in the Andrews' relationship was control over the insurance policy on Rob Andrew's life. After his brake lines were cut, Rob Andrew inquired about removing [Ms. Andrew] as beneficiary of his life insurance policy. Rob Andrew spoke with Pavatt's supervisor about changing the beneficiary. He also related his suspicions that Pavatt and [Ms. Andrew] were trying to kill him. At trial, the State presented evidence that in the months preceding the murder, [Ms. Andrew] and Pavatt actually attempted to transfer ownership of the insurance policy to [Ms. Andrew] without Rob Andrew's knowledge, by forging his signature to a change-of-ownership form and backdating it to March 2001.

In the days following the murder, Pavatt obtained information over the Internet about Argentina, because he had heard that country had no extradition agreement with the United States. Larson also testified that after the murder, [Ms. Andrew] and Pavatt asked her to help them create a document, with the forged signature of Rob Andrew, granting permission for his children to travel with [Ms. Andrew] out of the country. [Ms. Andrew] also asked Larson to transfer funds from her bank account to Larson's own account, so that Larson might wire them money after they left town.

[Ms. Andrew] did not attend her husband's funeral, choosing instead, to go to Mexico with Pavatt and the children. Pavatt called his daughter several

3

times from Mexico and asked her to send them money. Larson cooperated with the FBI and local authorities in trying to track down the pair.

After her apprehension, [Ms. Andrew] came into contact with Teresa Sullivan, who was a federal inmate at the Oklahoma County jail. Sullivan testified that [Ms. Andrew] told her that she and Pavatt killed her husband for the money, the kids, and each other. [Ms. Andrew] also told her that Pavatt shot her in the arm to make it look as if she was a victim.

Expert testimony opined that the wound to [Ms. Andrew]'s arm was not self-inflicted, but was part of a scheme to stage the scene to make it look like she was a victim, just like her husband.

*Andrew v. State* (*Andrew I*), 164 P.3d 176, 184–85 (Okla. Crim. App. 2007) (paragraph numbers and footnotes omitted), *as corrected* (July 9, 2007), *opinion corrected on denial of reh'g*, 168 P.3d 1150.[1]

---

[1] Ms. Andrew does not challenge these factual findings, and without clear and convincing evidence to the contrary, we presume them to be correct. *Lockett v. Trammel*, 711 F.3d 1218, 1222 (10th Cir. 2013); *see also* 28 U.S.C. § 2254(e)(1).